```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____               │
│ DATE FILED:___7/6/2023___            │
└─────────────────────────────────────┘
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**Heidi Drew Miller,**

                          **Plaintiff,**

               **-against-**

**Commissioner of Social Security,**

                        **Defendant.**

**22-cv-02527 (SDA)**

**OPINION AND ORDER**

---

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE:**

Plaintiff Heidi Drew Miller ("Miller" or "Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") that denied her application for Disability Insurance Benefits ("DIB"). (Compl., ECF No. 1.) Presently before the Court are the parties' cross-motions, pursuant to Federal Rule of Civil Procedure 12(c), for judgment on the pleadings. (Pl.'s Mot., ECF No. 17; Comm'r Mot., ECF No. 21.)

For the reasons set forth below, Plaintiff's motion for judgment on the pleadings is DENIED and the Commissioner's cross-motion is GRANTED.

## BACKGROUND

### I.  Procedural Background

On February 4, 2018, Miller filed an application for DIB with an alleged disability onset date of January 1, 2012. (Administrative R., ECF No. 16 ("R."), 143-45.) The Social Security Administration ("SSA") denied her application on May 8, 2018. (R. 54-60.) Thereafter, Miller filed a written request for a hearing before an Administrative Law Judge ("ALJ"). (R. 67.) On August 1,

2019, Miller appeared for a hearing before ALJ Vincent M. Cascio. (R. 33-53.) Miller was represented at the hearing by attorney Ari Nat. (R. 36.)

In a decision dated September 4, 2019, ALJ Cascio found Miller not disabled at any time between her alleged onset date and March 31, 2018, her date last insured.[1] (R. 15-27.) On September 20, 2019, Miller requested review of the ALJ decision from the Appeals Council. (R. 140-41.) The Appeals Council denied her request for review on August 26, 2020. (R. 1-3.) Miller subsequently filed an appeal in this Court. (*See* 7:20-CV-09094 (AEK), Compl., ECF No. 1.) The parties agreed to remand the first case for further administrative proceedings, and, on August 31, 2021, the Court endorsed the stipulation of remand and entered judgment. (R. 567-68.) Based on the Court's Order, the Appeals Council issued an Order, dated September 7, 2021, vacating the final decision and remanding the case to the ALJ for further consideration. (R. 569-72.) A second hearing was held before ALJ Cascio on December 7, 2021. (R. 542-66.) In a decision dated January 24, 2022, ALJ Cascio again found Miller not disabled between the alleged onset date of January 1, 2012 and her date last insured of March 31, 2018. (R. 526-36.) Miller bypassed written exceptions, making ALJ Cascio's January 24, 2022 decision the Commissioner's final decision. This action followed.

## II.    Non-Medical Evidence

Born on May 29, 1988, Miller was 23 years old on the alleged onset date. (R. 55.) Miller has a tenth-grade education. (R. 39.)

---

[1] To qualify for DIB, a claimant must be both disabled and insured for benefits. 42 U.S.C. § 423(a)(1)(A) & (C); 20 C.F.R. §§ 404.101, 404.120 & 404.315(a). The last date a person meets these requirements is commonly referred to as the date last insured.

### III.   Medical Evidence Before the ALJ

### A.   Crystal Run Healthcare – Treatment Records Prior to Date Last Insured

On February 29, 2012, Miller saw NP Katie Rudy for an office visit. (R. 407-11.) Miller reported worsening anxiety with panic attacks at least once per day, and that she was unable to work and handle stress. (R. 407.) Miller reported three triggers for her panic attacks: stress, pressure, and being in a large crowd, which caused hyperventilation, red blotching of her face, heart racing, and sweating palms. (*Id*.) Miller indicated that she had a history of anxiety for about one year and had been taking medication, but stopped due to pregnancy.[2] (*Id*.) Miller denied seeing a counselor or therapist for anxiety and wanted to restart medication. (*Id*.) NP Rudy assessed acute anxiety and prescribed 25 mg Zoloft and .25 mg of Xanax three times per day, as needed, and encouraged Miller to make an appointment with a therapist or counselor.  (R. 410.)

Miller saw NP Rudy again on March 9, 2012 for an annual physical examination and for follow-up regarding anxiety. (R. 400-06.) Miller reported that she was taking Xanax two to three times a day, but her anxiety level had stayed the same and she still was experiencing two to three panic attacks per day.  (R. 400.) Miller indicated that she had not seen a therapist or counselor but planned to schedule an appointment. (*Id*.) NP Rudy increased Miller's Xanax dosage to .5 mg twice per day, as needed. (R. 405.)

During her next visit, on March 23, 2012, Miller reported to NP Rudy that her anxiety was improving gradually and that her panic attacks were less intense, frequent, and shorter.  (R. 395.)

---

[2] Earlier records indicate that, in March 2011, another provider at Crystal Run, Dr. Lauren Herchak, D.O., prescribed Visatril, as needed, for anxiety and noted that if Miller began using it on a regular basis, she would need to re-evaluate her symptoms and possibly start a lose dose SSRI medication. (R. 416-17.) Miller gave birth to her daughter in January 2012. (*See* R. 407, 412.)

On psychiatric examination, NP Rudy noted that Miller was calm, smiling, and happy. (R. 398.) Miller verbalized intermittent anxiety but denied current anxiety. (*Id*.)

Miller saw NP Rudy again on June 1, 2012. (R. 391-94.) Miller reported that she was taking Zoloft daily and had been taking Xanax two to four times per week with a decreasing need until about one month ago when she ran out of medication. (R. 391.) Miller reported her mood was greatly improved and that her anxiety attacks were occurring less frequently and were less intense. (*Id*.) Miller denied tearfulness, depression and panic attacks. (*Id*.) NP Rudy continued Miller's Xanax prescription, but recommended that she avoid taking it daily. (*Id*.) NP Rudy also suggested further treatment with a therapist/counselor and provided Miller with a contact list of recommended counselors. (R. 393).

On August 13, 2012, Miller saw NP Rudy for a follow-up visit regarding her anxiety. (R. 386-90.) Miller reported that her functioning was not difficult at all, and NP Rudy noted that her initial symptoms had improved. (R. 386.) Miller presented with anxious/fearful thoughts, difficulty concentrating, difficulty falling asleep and excessive worrying, but denied other symptoms including depressed mood and difficulty staying asleep. (*Id*.) On psychiatric evaluation, NP Rudy noted that Miller sat calmly and quietly in the office with no agitation; answered questions and communicated appropriately; verbalized anxiety and panic attacks; was well groomed and dressed; and was negative for other findings. (R. 389.) NP Rudy assessed Miller's anxiety as stable, increased her Zoloft prescription to 75mg daily and refilled her Xanax prescription. (R. 390.) NP Rudy again encouraged Miller to obtain an evaluation by a counselor/therapist for coping mechanisms and planned to follow up with her in one month. (*Id*.)

On August 22, 2012, Miller saw NP Rudy for a follow-up visit regarding anxiety, a rash and allergies. (R. 380-85.) Miller reported that her anxiety was stable and reported occasional anxiety attacks. (R. 380.) NP Rudy assessed Miller's anxiety as stable and refilled her prescriptions. (R. 384.) Miller saw NP Rudy for another follow up visit on September 6, 2012. (R. 375-79.) Miller presented with anxious/fearful thoughts, fatigue and racing thoughts but denied other symptoms (R. 375.) Miller reported that she had started a new job as a customer service representative, but became anxious and stressed out and quit after approximately two weeks due to panic attacks. (*Id*.) NP Rudy noted that Miller's anxiety improved at home but was worse at work and in crowds. (*Id*.) On psychiatric evaluation, NP Rudy noted that Miller was verbalizing feelings of anxiety, but was communicating, talking, interacting and answering questions appropriately, and was sitting calmly and quietly with no agitation. (R. 379.) NP Rudy assessed Miller's anxiety and panic attacks as "worse" and increased Miller's dosage for Zoloft to 100mg and continued her prescription for Xanax. (*Id*.) NP Rudy suggested evaluation and management by a psychiatrist or therapist and provided Miller contact information. (*Id*.)

During a follow-up visit on October 17, 2012, Miller reported daily anxiety attacks with headaches after the attacks. (R. 370.) Miller reported that she was scheduled for an appointment with psychiatrist Dr. Robin Sloma the following day. [3] (*Id*.) NP Rudy noted that Miller had attempted to start working again at a warehouse job but became overwhelmed and anxious and quit. (*Id*.) On psychiatric examination, NP Rudy noted that Miller reported anxiety, but was well groomed and dressed appropriately and denied suicidal or homicidal ideations. (R. 373.) NP Rudy assessed chronic anxiety and provided Miller with refills of her prescriptions. (*Id*.)

---

[3] The record does not contain any records from Dr. Sloma.

The following month, on November 14, 2012, Miller saw NP Rudy for a follow-up visit due to anxiety. (R. 365-69.) NP Rudy noted that Miller's anxiety persisted with no improvement since increasing her dosage of Zoloft the month before. (R. 365.) NP Rudy further noted that Miller continued to have anxiety and panic attacks daily, but reported improvement with Xanax which she was taking three to four times per week. (*Id*.) Miller reported seeing a therapist two weeks before, but felt uncomfortable and planned to switch therapists. (*Id*.) On psychiatric examination, NP Rudy noted that Miller was talking fast and was anxious when discussing emotions. (R. 368.) Miller denied worsening anxiety or symptoms of depression. (*Id*.) NP Rudy assessed chronic anxiety and added a prescription for Buspar[4] while discontinuing Xanax. (R 369.) NP Rudy instructed Miller to schedule an appointment with a therapist/counselor and psychiatrist and discussed the importance of establishing with mental healthcare providers. (*Id*.)

On January 15, 2013, Miller saw Dr. Saed Qaqish, M.D. for an office visit, presenting with flu-like symptoms and anxiety. (R. 359-64.) Dr. Qaqish noted that Miller had been seeing NP Rudy for anxiety and had been taking Buspar for the past two months and reported that it was causing her nausea without any effect on her anxiety. (R. 359.) After discussing with NP Rudy, Dr. Saed refilled 20 tablets of Xanax with a plan for Miller to follow up with NP Rudy in one to two weeks. (R. 363.)

On May 10, 2013, Miller saw Dr. Nimfa Gabriana, M.D., for an annual physical examination. (R. 346-49.) Miller reported taking her Zoloft consistently at night and a half tab of Xanax every other day for anxiety management. (R. 346.) A mental status examination was unremarkable,

---

[4] Buspar, a brand of buspirone, is an anti-anxiety agent. *See Castillo v. Colvin*, No. 13-CV-05089 (AT) (MHD), 2015 WL 153412, at *4 n.9 (S.D.N.Y. Jan. 12, 2015) (citing 3 Attorneys Medical Deskbook § 39:8).

noting only that Miller was oriented to time, place person and situation and demonstrated appropriate mood and affect. (R. 348.)

On June 12, 2013, Miller saw Dr. Nabil Guindi, M.D., for a follow-up visit. (R. 339-41.) Dr. Guindi noted that Miller reported worsening anxiety after getting a new job, manifested by palpitation and chest tightness. (R. 339.) On psychiatric examination, Dr. Guindi noted that Miller was anxious, but did not exhibit compulsive behavior, was not forgetful, and had no suicidal ideation. (R. 340.) Dr. Guindi refilled Miller's prescription for Xanax and recommended that she follow-up with her primary care provider. (*Id*.)

Miller saw Laura Cox, FNP, on August 16, 2013 for an office visit, presenting with panic attacks. (R. 334-38.) Miller reported that she had stopped taking her Zoloft prescription three weeks earlier due to improvement in her anxiety, but in the past week started experiencing panic attacks occurring more than once a day (R. 334). Miller reported that she did not like taking Xanax because it caused drowsiness, but was ready to restart medications. (*Id*.) FNP Cox noted that Miller was treated by a counselor in May but noted no improvement. (*Id*.) On mental status examination, FNP Cox noted that Miller had no agitation or forgetfulness but appeared anxious with quick speech. (R. 338.) FNP Cox restarted Miller on Zoloft and decreased her Xanax dosage to .25 mg, as needed for panic attacks, due to drowsiness. (*Id*.) FNP Cox also noted that Miller was aware not to abruptly stop medication and was not interested in counseling at that time. (*Id*.)

Miller saw FNP Cox again for an annual physical examination on October 17, 2013. (R. 329-337.) Miller reported that she had stopped Zoloft three days before the examination due to fatigue, and stated that she had tremors and increased anxiety in the two days since. (R. 329.) Miller reported anxiety symptoms more than once per day and requested a refill of Xanax, which

she reported provided some relief. (*Id*.) Miller reported a significant increase in mood swings and stated that her family members were concerned she was bipolar. (*Id*.) Miller also reported an increase in anger. (*Id*.) FNP Cox discussed withdrawal symptoms of Zoloft with Miller, which she noted was the likely cause of her current symptoms. (R. 332.) FNP Cox noted that Miller would restart and then taper off Zoloft and that Miller declined a new SSRI/SNRI at that time. (*Id*.) FNP Cox also refilled Miller's prescription for Xanax. (*Id*.) FNP Cox noted that Miller was willing to see a psychiatrist and counselor and provided her with contact information. (*Id*.)

Miller next saw FNP Cox for a follow-up visit on March 27, 2014. (R. 320-24.) FNP Cox noted that Miller had not been taking Zoloft for the past five months and reported that her symptoms of panic attacks occurred less than once per week and that her symptoms improve with the use of Xanax. (R. 320.) FNP Cox noted that Miller did not see a counselor. (*Id*.)  On psychiatric examination, FNP Cox noted that Miller was not anxious, fearful, agitated or forgetful and had normal affect. (R. 323.) FNP Cox noted that Miller was not taking an SSRI and was using Xanax once per week. (*Id*.) FNP Cox renewed Miller's prescription for Xanax and noted that Miller declined counseling. (*Id*.)

On April 2, 2014, Miller saw FNP Cox for an annual physical examination. (R. 312-19.) FNP Cox noted that Miller needed the physical for her job as a patient care assistant. (R. 312.) FNP Cox noted that Miller had a history of anxiety, which was controlled using Xanax and that Miller used Xanax two to three times per week with increased anxiety. (*Id*.) On psychiatric examination, FNP Cox noted normal insight, normal judgment and appropriate mood and effect. (R. 318.) For assessment, FNP noted that Miller's anxiety was stable and prescribed Xanax as needed. (*Id*.)

Miller was not seen again for anxiety management until February 17, 2015.  (R. 297-300.)

Miller saw Dr. Aasma Riaz, M.D. who noted that Miller suffered from anxiety daily, took Xanax as

needed and had been taking Zoloft but reported that it did not help. (R. 297.) Miller reported

having two to three panic attacks per day that interfered with her daily routine and activities. (*Id*.)

Dr. Riaz started her on Busipirone and Klonopin, as needed, and recommended that she follow-

up in one month. (R. 299.) On March 20, 2015, Miller saw Dr. Riaz for a follow-up appointment.

(R. 294-96.) Miller reported that Busipirone was not providing any relief and she still was

experiencing panic attacks two to three times per day. (R. 294.) Miller also reported that Klonopin

was making her groggy. (*Id.*) Dr. Riaz discontinued Busipirone and Klonopin and started Miller on

a trial of Wellbutrin in addition to Xanax, as needed. (R. 296.)

On April 21, 2015, Miller saw FNP Zaneta Martinez for an annual physical examination. (R.

289-93.) Miller reported no complaints. (R. 289.) On August 25, 2015, Miller saw Deborah Spence,

M.D. for an annual exam and early pregnancy confirmation. (R. 283-88.) Miller reported that she

had stopped taking Wellbutrin and Xanax a few days earlier. (R. 283; *see also* R. 287.)

Miller saw Dr. Shawkat Massih for an annual physical examination on December 21, 2017.

(R. 240-44.) Miller's only psychological complaint was insomnia. (R. 240.) Dr. Massih started her

on a trial of melatonin.[5] (R. 244.)

### B.    Crystal Run Healthcare – Treatment Records After Date Last Insured

On April 10, 2018, Miller saw Dr. Stacey Whyte Connell, D.O., for an office visit for

headaches, pain, depression and anxiety. (R. 235-39.) Miller complained of back pain, migraine

---

[5] The remaining medical records from Crystal Run are from April 2018 through October 2018, after Miller's date last insured. (R. 224-39, 477-96.)

headaches, panic attacks and knee pain. (R. 235.) Miller reported having migraines aggravated by panic attacks, to the point where she would usually have to lie down in a dark room to get some relief. (Id.) Dr. Connell started her on Lexapro for depression/anxiety and Sumatriptan for migraines and ordered diagnostic testing of the cervical spine and recommended physical therapy. (R. 238-39.) During a follow-up visit on April 30, 2018, Miller reported Lexapro was not working and she was experiencing migraine headaches but denied panic attacks. (R. 228.) Dr. Connell prescribed Effexor, as an alternative to Lexapro and referred Miller to neurology for a consultation regarding her headaches. (R. 230.)

Miller saw Dr. Adrienne Salomon, M.D., on August 7, 2018 for a neurology consultation for chronic migraines. (R. 481-86.)  Miller stated that she had suffered migraines since she was young, but they had recently worsened and that she was experiencing two migraines a day. (R. 481.) Miller reported photophobia, phonophobia, and blurred vision. (*Id*.) Dr. Salomon assessed that Miller's chronic migraines were likely a rebound from Tylenol overuse and started her on new medication. (R. 485.) Dr. Solomon also ordered further diagnostic evaluations including an MRI of the brain. (*Id*.)

On October 16, 2018, Miller saw Dr Connell for an office visit regarding pain, depression and anxiety. (R. 487-91.) Miller reported getting stress hives and having panic attacks two times a day, three to four times a week. (R. 487.) Miller also reported seeing a therapist, who took her out of work. (*Id*.)  Dr. Connell prescribed medication for the hives and recommended Miller follow up with her mental health counselor and other providers. (R. 490-91.)

**C.      July 26, 2018 Psychiatric Assessment – Anne Solomon, LCSW**

In a psychiatric assessment for determination of employability dated July 26, 2018, LCSW Anne Solomon, who had begun weekly therapy sessions with Miller the week before at Access Supports for Living Inc., diagnosed Miller with panic disorder.[6] (R. 500.) LCSW Solomon noted that Miller "on occasion" experienced loss of job or failure to complete an education or training program attributed to psychiatric conditions and frequently had her behavior interfere with activities of daily living and experienced decompensation. (R. 501.) LCSW Solomon opined that Miller was "moderately limited" in her ability to understand and remember simple or complex instructions, maintain attention and concentration and use public transportation and "very limited" in her ability to perform low stress, simple tasks. (*Id*.)

**D.      March 25, 2019 Internal Medicine Examination – Dr. Trevor Litchmore, M.D.**

On March 25, 2019, Miller saw Dr. Trevor Litchmore for an internal medicine consultative examination. (R. 465-68.) Miller reported having migraine headaches which had been diagnosed two years before. (R. 465.) Miller reported approximately three episodes per month, associated with nausea and vomiting, and that light and noise increased her headaches. (*Id*.) Dr. Litchmore noted that Miller had been diagnosed with depression and anxiety in 2012 with no hospitalizations. (*Id*.)  Miller's only listed medication was Propranolol.[7] (*Id*.) For activities of daily living, Miller reported cooking, cleaning and childcare. (*Id*.) She last worked in February 2018 as a service representative at a car dealership. (*Id*.)

---

[6] Miller continued to see LCSW Solomon through at least December 2018. (R. 502-22.)

[7] "Propranolol is a beta blocker that works by relaxing blood vessels and slowing the heart rate to improve blood flow and decrease blood pressure, and is used to prevent migraine headaches." *Martinez v. Comm'r of Soc. Sec.*, No. 21-CV-11054 (SLC), 2023 WL 2707319, at *3 n.8 (S.D.N.Y. Mar. 30, 2023).

On neurologic examination, Dr. Litchmore noted positive Phalen sign[8] of Miller's right wrist, but that the examination was otherwise unremarkable.  (R. 467.)  A mental status screen noted that Miller was alert and oriented x3,[9] but Dr. Litchmore "defer[ed] the remainder to Psychology." (*Id*.) Dr. Litchmore diagnosed migraine headache, active carpal tunnel syndrome of the right wrist and depression and anxiety and found that Miller's prognosis was fair. (*Id*.) Dr. Litchmore opined, "on the basis of the physical exam," that Miller would have "marked limitation in terms of activities that require moderate to marked physical exertion within the context of her migraine headaches." (*Id*.)  He further opined that Miller would "have marked limitation in terms of activities that require repetitive twisting, turning, grasping of her right wrist in the context of active carpal tunnel syndrome of right wrist" and deferred to Psychology regarding Miller's depression and anxiety. (*Id*.)

E.  **March 25, 2019 Psychiatric Examination – Dr. Alison Murphy, Ph.D.**

On March 25, 2019 Miller saw Dr. Alison Murphy for a psychiatric consultative evaluation. (R. 471-75.) Miller reported that she last was employed in 2018 as a service receptionist and held the job for two weeks until she became very anxious and could no longer fulfill her duties. (R. 471.) For psychiatric history, Dr. Murphy noted that, since September 2018, Miller had been seeing therapist Ann Solomon every two weeks to address depression and anxiety. (R. 471.) Regarding her current functioning, Miller reported difficulty falling asleep and frequent

---

[8] "A positive Phalen's sign may be an indication of the presence of carpal tunnel syndrome." *Brennan v. Colvin*, No. 13-CV-06338 (AJN) (RLE), 2015 WL 1402204, at *4 n.4 (S.D.N.Y. Mar. 25, 2015).

[9] "Alert and Oriented x3 refers to a patient who is responsive to his or her environment, and knows (1) who he or she is; (2) where he or she is; and (3) the approximate time." *Bracken v. Colvin*, No. 16-CV-09488 (LTS) (KHP), 2017 WL 5999952, at *2 n.5 (S.D.N.Y. Sept. 19, 2017), *report and recommendation adopted*, 2017 WL 6001846 (S.D.N.Y. Dec. 4, 2017).

awakening; depressive and anxiety-related symptoms; and panic attacks occurring every other day and lasting from 15 minutes to hours. (R. 471-72.) Under drug and alcohol history, Dr. Murphy noted that Miller reported using marijuana every night since 2012 to help her sleep. (R. 472.)

On mental status examination, Dr. Murphy found that Miller was cooperative with adequate manner of relating, social skills and overall presentation. (R. 472.) Miller's thought processes were coherent and goal directed; she had full range of affect and reported "feeling okay today." (*Id.*) Dr. Murphy noted Miller's attention and concentration were moderately impaired due to limited intellectual functioning; her recent and remote memory skills were intact; her intellectual functioning was average; and her insight and judgment were fair. (R. 473.) Miller reported that she could dress, bathe, groom herself independently; cook and clean independently; and drive independently; but her mother helped with laundry and shopping because she became very anxious. (*Id.*)

Dr. Murphy opined that Miller had no limitations in her ability to understand, remember, or apply simple directions and instructions; maintain personal hygiene and appropriate attire and maintain awareness of normal hazards and take appropriate precautions; mild limitations in her ability to understand, remember, or apply complex directions and instructions; and use reason and judgement to make work related decisions; and moderate limitations in her ability to interact adequately with supervisors, coworkers, and the public; sustain concentration and perform a task at a consistent pace; sustain an ordinary routine and regular attendance at work; and regulate emotions, control behavior and maintain well-being. (R. 473-74.)

Dr. Murphy diagnosed Miller with unspecified depressive disorder, unspecified anxiety disorder, post-traumatic stress disorder, panic attacks without agoraphobia, specific learning

disorder, cannabis use disorder, and a history of unspecified obsessive-compulsive disorder. (R. 474.) Dr. Murphy recommended that Miller continue with psychological treatment as currently provided and also recommended psychiatric intervention and vocational training. (*Id*.)

### IV.   The Administrative Hearings

#### A.   Plaintiff's Testimony

Miller, along with counsel, appeared for her first administrative hearing on August 1, 2019. (R. 38-48.) Miller testified that she could not work due to panic attacks three or four times a week and problems with her back, knee, hands and migraine headaches. (R. 40.) Regarding her hand function, Miller testified that she could pick up a coin or pencil from a table, reach overhead and sometimes write her name, although her hands became stiff, and she could make a loose fist. (R. 44.) In terms of daily activity, Miller testified that she could make breakfast, get ready for school, clean, cook, bake and read, unless she had a panic attack. (R. 45-46.) Miller further testified that her mother assisted her with laundry, grocery shopping and sometimes cooking. (R. 46.)

Miller, along with counsel, appeared for a second administrative hearing, which was conducted via telephone, on December 7, 2021. (R. 550-59.) Miller testified that that she drove her children to school and attended to her personal needs. (R. 551.) She testified that she had anxiety and panic attacks around other people but also when by herself. (R. 558.)

#### B.   Vocational Expert Testimony

VE Theresa Hopkins testified at the December 7, 2021 hearing. (R. 560-65.) The ALJ asked VE Hopkins whether there would be jobs in the national economist for a hypothetical person of Miller's age, education and work history who had the RFC to perform the full range of light work, except could occasionally climb ramps and stairs; could not climb ladders, ropes or scaffolds;

could occasionally stoop and crouch; could not have exposure to unprotected heights or hazardous machinery; and who could understand, remember and carry out simple, routine repetitive work-related tasks with only occasional contact with the public, coworkers and supervisors. (R. 561.) VE Hopkins testified that such a person could perform the jobs of routing clerk, mail clerk and photocopy machine operator. (R. 561-62.)

The ALJ next asked about a second hypothetical person who could perform work at all exertional levels, with similar non-exertional restrictions and VE Hopkins offered the same three jobs. (R. 562.) The ALJ also asked about whether either of those hypothetical people could be off task 15 percent of the workday, to which VE Hopkins testified that there would be no competitive employment and it would require an accommodation. (R. 563.) VE Hopkins further testified that the jobs identified generally allowed up to 10 percent off task in an eight-hour day and one absence per month after a 30-day probationary period. (*Id*.)

Miller's attorney asked VE Hopkins if those jobs would still be available if the hypothetical person further was limited to no production rate quotas and VE Hopkins testified that they would. (R. 564.)

## V.     **ALJ Cascio's Decision And Appeals Council Review**

Applying the Commissioner's five-step sequential evaluation, *see infra* Legal Standards Section II, the ALJ found at step one that Miller had not engaged in substantial gainful activity between January 1, 2012, the alleged onset date, and March 31, 2018, her date last insured. (R. 528.) At step two, the ALJ determined that Miller had the following severe impairments: migraine headaches; depressive disorder; anxiety disorder; post-traumatic stress disorder; panic attacks without agoraphobia; learning disorder and cannabis use disorder. (R. 529.)

At step three, the ALJ found that Miller did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 529-30.) The ALJ specifically considered Listings 12.04 and 12.06. (R. 529.) The ALJ discussed the "paragraph B" criteria[10] and found that Miller had a mild limitation in understanding, remembering or applying information and moderate limitations in interacting with others; concentrating, persisting or maintaining pace; and adapting or managing oneself. (R. 529-30.) Accordingly, the ALJ found that the paragraph B criteria were not satisfied. (R. 530) The ALJ also considered whether the "paragraph C"[11] criteria were satisfied, but found that the evidence failed to establish the presence of those criteria because the evidence did not support a finding of marginal adjustment. (*Id*.)

The ALJ then assessed Miller's RFC and determined that she was able to perform light work, except she could only occasionally climb ramps and stairs; could not climb ropes, ladders or scaffolds; was limited to occasional stooping and crouching; could not have exposure to unprotected heights or hazardous machinery; and was limited to understanding, remembering

---

[10] The paragraph B criteria "represent the areas of mental functioning a person uses in a work setting." 20 C.F.R. § 404, Subpt. P, App'x 1. They are: "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." *Id*. To satisfy the paragraph B criteria, a claimant's mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning. *Id*.

[11] Paragraph C of Listings 12.04 and 12.06, among others, provides the criteria used to evaluate "serious and persistent mental disorders." 20 C.F.R. § 404, Subpt. P, App'x 1. To satisfy the paragraph C criteria, there must be "a medically documented history of the existence of the claimant's mental disorder over a period of at least two years, and evidence of both: (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the claimant's] mental disorder," and "(2) marginal adjustment," *i.e.*, "minimal capacity to adapt to changes in [the claimant's] environment or to demands that are not already part of [the claimant's] daily life." *Id*.

and carrying out simple, routine repetitive work-related tasks, with only occasional contact with the public, co-workers and supervisors. (R. 530.)

At step four, the ALJ noted that Miller had no past relevant work. (R. 534.) At step five, the ALJ considered Miller's age, education, work experience and RFC and concluded, based on VE Hopkins's testimony, that there were jobs existing in significant numbers in the national economy that Miller could perform, including routing clerk, mail clerk and photocopy machine operator. (R. 535.) Therefore, the ALJ found that Miller was not disabled during the relevant period and denied her claim for benefits. (R. 536.)

## LEGAL STANDARDS

### I.    Standard Of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am., Local 537*, 47 F.3d 14, 16 (2d Cir. 1994) (citing Fed. R. Civ. P. 12(c)). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

"The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009); *accord Johnson v.*

*Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). A court must set aside legally erroneous agency action unless "application of the correct legal principles to the record could lead only to the same conclusion," rendering the errors harmless. *Garcia v. Berryhill*, No. 17-CV-10064 (BCM), 2018 WL 5961423, at *11 (S.D.N.Y. Nov. 14, 2018) (quoting *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010)).

Absent legal error, the ALJ's disability determination may be set aside only if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). However, "[t]he substantial evidence standard is a very deferential standard of review—even more so than the clearly erroneous standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder *would have to conclude otherwise*." *Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), *as amended* (Apr. 30, 2019) (summary order) (emphasis in original) (citation and internal quotation marks omitted). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

## II.   <u>Determination Of Disability</u>

A person is considered disabled for benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

In determining whether an individual is disabled, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 [(the "Listings")] . . . and meets the duration requirement, we will find that you are disabled.

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work,

we will find that you are not disabled. If you cannot make an adjustment to other
work, we will find that you are disabled.

20 C.F.R. § 404.1520(a)(4) (internal citations omitted).

If it is determined that the claimant is or is not disabled at any step of the evaluation
process, the evaluation will not progress to the next step. 20 C.F.R. § 404.1520(a)(4).

After the first three steps (assuming that the claimant's impairments do not meet or
medically equal any of the Listings), the Commissioner is required to assess the claimant's RFC
"based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R.
§ 404.1520(e). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's]
limitations." 20 C.F.R. § 404.1545(a)(1).

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198
F.3d 45, 51 (2d Cir. 1999) (citation omitted). It is only after the claimant proves that she cannot
return to work that the burden shifts to the Commissioner to show, at step five, that other work
exists in the national and local economies that the claimant can perform, given the claimant's
RFC, age, education and past relevant work experience. *Id.* at 50-51.

**III.**     **Regulations Regarding Consideration Of Medical Opinions And Prior Findings For
Applications Filed On Or After March 27, 2017**

Under the regulations applicable to Plaintiff's claim, the ALJ considers five factors in
evaluating the persuasiveness of medical opinions: (1) supportability; (2) consistency; (3)
relationship of the source with the claimant, including length of the treatment relationship,
frequency of examination, purpose of the treatment relationship, extent of the treatment
relationship and whether the relationship is an examining relationship; (4) the medical source's
specialization; and (5) other factors, including but not limited to "evidence showing a medical

source has familiarity with the other evidence in the claim or an understanding of [the SSA] disability program's policies and evidentiary requirements." 20 CFR § 404.1520c(c). Using these factors, the most important of which are supportability and consistency, the ALJ must articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." *Id.* § 404.1520c(b).

With respect to the supportability factor, the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 CFR § 404.1520c(c)(1). As to the consistency factor, the regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2). While the ALJ "may, but [is] not required to, explain how [he] considered" the factors of relationship with the claimant, the medical source's specialization, and other factors, the ALJ "*will* explain how [he] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings." *Id.* § 404.1520c(b)(2) (emphasis added).

An ALJ must provide sufficient explanation to allow a reviewing court to "trace the path of [the] adjudicator's reasoning." *Amber H. v. Saul*, No. 20-CV-00490 (ATB), 2021 WL 2076219, at *6 (N.D.N.Y. May 24, 2021) (quoting *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819 (F.R.), 82 Fed. Reg. 5844-01, at *5858 (Jan. 18, 2017) ("We expect that the articulation requirements in these final rules will allow a . . . reviewing court to trace the path

of an adjudicator's reasoning . . . .")). An ALJ commits "procedural error by failing to explain how it considered the supportability and consistency of medical opinions in the record." *Loucks v. Kijakazi*, No. 21-1749, 2022 WL 2189293, at *2 (2d Cir. June 17, 2022). However, a court can "affirm if 'a searching review of the record' assures [the court] 'that the substance of the [regulation] was not traversed.'" *Id*. (quoting *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019)).

<u>**DISCUSSION**</u>

Plaintiff argues that this action should be remanded for further proceedings because the ALJ failed to properly assess the opinion evidence regarding her mental and physical impairments. (Pl.'s Mem., ECF No. 18, at 8-13; Pl.'s Reply, ECF No. 23, at 1-2.) In her cross-motion, the Commissioner argues that ALJ properly considered the medical opinion evidence and the RFC determination is supported by substantial evidence. (Comm'r Mem., ECF No. 22, at 17-22.)

Plaintiff first argues that the ALJ did not explain what specific evidence was consistent with Dr. Murphy's opinion. (Pl.'s Mem. at 9.) The ALJ found Dr. Murphy's opinion persuasive because it was based upon a thorough exam and consistent with the records. (R. 534.) Although the Court agrees that this explanation lacks the desired specificity, a review of the record assures the Court that the substance of the regulation was not traversed. *See Loucks*, 2022 WL 2189293, at *2. As the ALJ noted, Miller's treatment records include "waxing and waning symptoms with generally good reported response to medication prior to the date last insured, with an intact capacity for activities of daily living and no need for more aggressive treatment modalities." (R. 534.) Indeed, as Plaintiff recognizes (Pl.'s Mem. at 9), the ALJ cited similar factors in finding persuasive LCSW Solomon's opinion regarding moderate limitations. (*Id*.) Accordingly, the Court finds that the ALJ's analysis of the consistency factor is not an error warranting remand. *See Adam*

*R. T. v. Comm'r of Soc. Sec.*, No. 21-CV-01170 (FJS) (ATB), 2023 WL 1775689, at *4-5 (N.D.N.Y. Feb. 6, 2023) (ALJ's reference to consistency with overall record without further explanation was, at most, harmless error when court could glean ALJ's rationale from analysis of medical findings and other opinions); *Regino v. Comm'r of Soc. Sec.*, No. 20-CV-08518 (RA) (BCM), 2022 WL 4369919, at *15 (S.D.N.Y. Aug. 31, 2022), *report and recommendation adopted*, 2022 WL 4368187 (S.D.N.Y. Sept. 21, 2022) (applying harmless error analysis).

The ALJ also reasonably concluded that the portion of LCSW Solomon's opinion indicating that Miller would be very limited in performing low stress, simple tasks was less persuasive than Dr. Murphy's opinion because it was inconsistent with Miller's daily activities and good mental exams. (R. 534.) Much of Plaintiff's argument regarding the ALJ's assessment of the opinion evidence stems from her view that the record supports greater limitations that those in the RFC. (Pl.'s Mem. at 9-12.) However, contrary to Plaintiff's assertion, the ALJ did not rely only on evidence of improvement but discussed the medical evidence in the record as a whole and specifically noted "waxing and waning symptoms" in limiting Plaintiff to simple, routine, repetitive work-related tasks with only occasional contact with the public, co-workers and supervisors. (R. 530-34; *see also* Comm'r Mem. at 21.) In addition, the ALJ properly relied on Plaintiff's activities of daily living in considering the opinion evidence and assessing her RFC. *See McMillian v. Comm'r of Soc. Sec.*, No. 20-CV-07626 (KHP), 2022 WL 457400, at *6 (S.D.N.Y. Feb. 15, 2022) (citing *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 9 (2d Cir. 2017) (finding that ALJ could rely on activities of daily living to formulate RFC assessment)). Plaintiff suggests that Dr. Murphy was unfamiliar with the record and, thus, his opinion was not very valuable (Pl.'s Mem. at 10-11), but it is not clear that LCSW Solomon, who only had seen Plaintiff once prior to

rendering her opinion, had greater familiarity with Plaintiff's treatment history. (*See* Comm'r Mem. at 20-21.) In any event, it is not the function of this Court to re-weigh the evidence. *See Krull v. Colvin*, 669 Fed. App'x 31, 32 (2d Cir 2016) ("[Plaintiff's] disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it.")

Plaintiff further argues that the ALJ erred because Dr. Murphy and LCSW Solomon "used terms like moderate, which were not in the RFC" and the ALJ did not explain how he translated mild or moderate limitations into the RFC determination. (Pl.'s Mem. at 11.) However, "[t]he Second Circuit has repeatedly held that 'moderate' limitations do not preclude a plaintiff's ability to perform unskilled work." *Patterson v. Comm'r of Soc. Sec.*, No. 18-CV-00556 (WBC), 2019 WL 4573752, at *4 (W.D.N.Y. Sept. 20, 2019) (citing  McIntyre v. Colvin, 758 F.3d 146, 149 (2d Cir. 2014)); *see also Platt v. Comm'r of Soc. Sec.*, 588 F. Supp. 3d 412, 422 (S.D.N.Y. Mar. 3, 2022) ("It is well settled that a limitation to unskilled work sufficiently accounts for moderate limitations in work-related functioning."); *McMillian*, 2022 WL 457400, at *6 (RFC limiting plaintiff to simple, routine tasks adequately accounted for moderate limitations in concentration and understanding simple directions and instructions) (collecting cases); *Arthur M. v. Saul*, No. 20-CV-06174 (MJR), 2021 WL 2309884, at *4 (W.D.N.Y. June 7, 2021) (restriction to only occasional interaction with co-workers, supervisors, and the public accommodated moderate limitation in social interactions) (collecting cases).

Finally, Plaintiff argues that the ALJ failed to adequately consider the opinion of Dr. Litchmore regarding her physical health. (Pl.'s Mem. at 12-13.) The ALJ found Dr. Litchmore's opinion "not persuasive" because it was not supported by or consistent with his examination and

not consistent with any objective medical exams or testing contained in the medical records. (R. 534.) In discussing Dr. Litchmore's examination, the ALJ noted that the physical exam was normal, except for the positive Phalen sign, with full strength in the extremities and dexterity in both hands. (R. 533; *see also* 467.) Plaintiff faults the ALJ for not elaborating on what exams/testing were inconsistent, suggesting that the lack of contradictory evidence should have bolstered Dr. Litchmore's opinion (Pl.'s Mem. at 12), but the ALJ was not required to specifically rebut Dr. Litchmore's opinion. *See Benjamin R. v. Comm'r of Soc. Sec.*, No. 21-CV-06109 (LJV), 2023 WL 2955840, at *2 (W.D.N.Y. Apr. 14, 2023). Rather, "[c]onsistency is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record." *Acosta Cuevas v. Comm'r of Soc. Sec.*, No. 20-CV-00502 (AJN) (KHP), 2021 WL 363682, at *10 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted*, 2022 WL 717612 (S.D.N.Y. Mar. 10, 2022).

Notably, the record does not reflect any treatment or symptoms of Miller's carpal tunnel syndrome during the relevant time period.[12] As the ALJ explained, other than the positive Phalen sign, Dr. Litchmore's findings themselves were benign, with no impairments in fine motor activity of the hands. (R. 533 (citing R. 467) (noting that claimant could unzip the zipper, untie the shoelace and unbutton the button and that grip strength was 5/5 bilaterally.) Accordingly, the Court finds that the ALJ reasonably concluded that the marked limitations in activities requiring repetitive twisting, turning and grasping opined to by Dr. Litchmore were not warranted. *See Obenza v. Comm'r of Soc. Sec.*, No. 19-CV-05444 (VSB) (SDA), 2020 WL 3001635, at *8 (S.D.N.Y.

---

[12] Dr. Litchmore's examination noting a positive Phalen sign occurred on March 25, 2019 (R. 465), and Plaintiff's testimony that sometimes her hands got stiff such that she could not write her name was from the August 1, 2019 hearing. (R. 44.)

May 8, 2020), *report and recommendation adopted*, 2020 WL 3000398 (S.D.N.Y. June 3, 2020) (greater limitations relating to carpal tunnel syndrome not warranted when, despite positive Phalen's sign, medication record did not reflect any additional treatment or evaluation during relevant period); *Cathy M. v. Comm'r of Soc. Sec.*, No. 20-CV-01787, 2022 WL 10029061, at *4 (W.D.N.Y. Oct. 17, 2022) (rejecting extreme limitations that lacked relation to medical record); *Elizabeth H. v. Comm'r of Soc. Sec.*, No. 19-CV-01020 (CFH), 2020 WL 4501495, at *10 (N.D.N.Y. Aug. 5, 2020) (rejecting significant limitations in grasping and fine manipulations when not supported by other objective medical evidence). Similarly, the ALJ reasonably determined that neither Dr. Litchmore's examination nor other medical evidence from the relevant time period supported greater limitations in activities that require moderate to marked physical exertion based on migraine headaches. (R. 534; *see also* Comm'r Mem. at 24.) Thus, the Court finds that the ALJ adequately considered Dr. Litchmore's opinion.

## CONCLUSION

For the reasons set forth above, Plaintiff's motion for judgment on the pleadings (ECF No. 17) is DENIED and the Commissioner's cross-motion (ECF No. 21) is GRANTED. The Clerk of Court is respectfully requested to close this case.

**SO ORDERED.**

Dated:       New York, New York
             July 6, 2023

_____
STEWART D. AARON
United States Magistrate Judge